UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
JAMES KILKENNY, ET AL., as
Trustees of the Construction Council
Local Union 175 Pension Fund, JAMES
KILKENNY, ET AL., as Trustees of the
Construction Council Local 175 Welfare
Fund, JAMES KILKENNY, ET AL., as
Trustees of the Construction Council
Local 175 Annuity Fund, and JAMES
KILKENNY, ET AL., as Trustees of the
Construction Council Local 175 Training
Fund,

**MEMORANDUM AND ORDER**
Case No. 20-CV-4765-FB-TAM

               Plaintiffs,

  -against-

MANCO ENTERPRISES, INC.,
MANETTA ENTERPRISES, INC., and
RIMANI GROUP, INC.,

               Defendants.
---------------------------------------------------x

*Appearances:*
For the Plaintiffs:
ELISE S. FELDMAN
Rothman Rocco LaRuffa, LLP
3 West Main Street, Suite 200
Elmsford, New York 10523

*For Defendants Manco Enterprises, Inc., and Manetta Enterprises, Inc:*
ANDREA H. MARCUS
161 West 61st Street, 19th Floor
New York, New York 10023

*For Defendant Rimani Group, Inc.:*
AARON C. SCHLESINGER
LAUREN RAYNER DAVIS
Peckar & Abramson, P.C.
1325 Avenue of the Americas
New York, New York 10019

**BLOCK, Senior District Judge:**

In this ERISA action, the trustees of various union welfare funds ("the Funds") seek to audit the books of Manco Enterprises, Inc. ("Manco"), Manetta Enterprises, Inc. ("Manetta"), and Rimani Group, Inc. ("Rimani"), and, ultimately, to recover any unpaid contributions found to be owning. All parties move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Their motions present the issues addressed below.

**A.      Timeliness**

The statute of limitations for delinquent contributions is six years. *See Miles v. N.Y. State Teamsters Conf. Pension & Ret. Fund Emp. Pension Ben. Plan*, 698 F.2d 593, 598 (2d Cir. 1983) (borrowing New York's statute of limitations for breach of contract). The Funds filed their complaint on October 5, 2020. They concede that claims for any contributions owing as of October 5, 2014, would be time-barred.

Defendants argue that *all* claims are barred because the Funds first knew or should have known that Manco made no contributions to the Funds after June 30, 2008. Be that as it may, a claim for delinquent contributions does not accrue until the contributions come due. *See Bldg. Serv. 32BJ Health Fund v. GCA Serv. Group, Inc.*, 232 F. Supp. 3d 343, 351 (S.D.N.Y. 2017). Regardless of when the Funds first learned that Manco was not making contributions as they thought he

should, they had no claim for contributions until they were due. *See Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007) ("If . . . a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew."). Thus, claims for any unpaid contributions that came due on or after October 5, 2014, are not time-barred.

**B.     Liability under Successor CBAs**

In 2005 Manco signed a collective bargaining agreement ("CBA") with United Plant and Production Workers Local Union 175 ("Local 175"). Some two years later, it signed a "Paving Division Assumption Agreement" in which it agreed to be bound to the terms of a CBA between Local 175 and the New York Independent Contractor's Alliance ("NYICA"), a multi-employer bargaining unit. One of the terms of the Local 175-NYICA CBA required employers to make contributions to the Funds.

In addition to accepting the Local 175-NYICA CBA then in effect, Manco agreed that NYICA would "negotiate successor Collective Bargaining Agreements, amendments, renewals and extensions of the Collective Bargaining Agreements" on its behalf, and that it would be bound "by any and all amendments, renewals and/or extensions of the above referenced Alliance Collective Bargaining Agreements." Decl. of Charles Priolo (May 24, 2022), Ex. G ¶ 5. That agreement was to continue "unless and until this Agreement is terminated by either the

3

Employer or the Union in accordance with the renewal and/or Termination Provisions of the Alliance Collective Bargaining Agreement." *Id.*

The Local 175-NYICA CBA in effect at the time of the assumption agreement ran from July 1, 2005, to June 30, 2008, but would be automatically renewed unless "written notice of termination or proposed changes shall have been served by either party on the other party" by March 15 of the final year.  Priolo Decl., Ex. H art. IV.  Local 175 and NYICA negotiated successor CBAs in 2008, 2011, 2014, 2017.  The 2017 CBA was in effect until June 30, 2022.

The Funds argue that, by virtue of the assumption agreement, Manco was required to make contributions to the Funds by the 2005 CBA and all of its successors.  In response, Defendants argue that Manco was bound only until June 30, 2008.  They base that argument on a March 12, 2008, letter from Local 175 to NYICA.  Opening with the subject line "Re: Opening of Collective Bargaining Negotiations," the letter sought to "negotiate renewal of the existing Agreement," with a proviso that "the Union will seek modifications in said collective agreement."  Priolo Decl., Ex. R.[1]  Defendants argue that the letter effectively terminated the 2005 CBA and, with it, Manco's obligation to be bound by successor CBAs under the assumption agreement.

---

[1] Local 175 sent NYICA similar letters prior to the slated expirations of the 2008, 2011 and 2014 CBAs.

The Court disagrees. As an initial matter, courts have endorsed the National Labor Relations Board's longstanding rule that withdrawal from a multiemployer bargaining unit requires clear written notice prior to the beginning of contract negotiations. *See Charles D. Bonanno Linen Serv., Inc. v. N.L.R.B.*, 454 U.S. 404, 410-11 (1982) (citing *Retail Assocs., Inc.*, 120 N.L.R.B. 388, 395 (1958)). Manco gave no such notice and, indeed, continued to appear on lists of "signatory contractors" that NYICA purported to represent. *See* Priolo Decl., Exs. R-U.[2]

The Court's research has not revealed any cases addressing whether a union and employer can contract around the N.L.R.B.'s rule for unilateral withdrawal. But even if they can agree to a different method of terminating membership in a multiemployer unit, Local 175's letter did not effect such a termination.

Termination of the assumption agreement is predicated on termination of the CBA between Local 175 and NYICA. The CBA, in turns, contemplates automatic renewal absent "written notice of termination *or proposed changes*." Priolo Decl., Ex. H art. IV (emphasis added). Local 175's letter plainly gave notice of proposed changes, not termination.

The CBA did not automatically renew, of course, because Local 175's

---

[2] In *Charles D. Bananno*, the Supreme Court stated that the N.L.R.B.'s rule permitted "any party to withdraw." 454 U.S. at 410. The Court presumably did not mean that a union could unilaterally oust an employer from a multiemployer unit. In any event, Local 175 did not raise any objection to NYICA's continued representation of Manco.

5

proposed changes first had to be addressed through collective bargaining. But it did not automatically terminate, either. The purpose of a termination provision like the one in the Local 175-NYICA CBA "is to give the parties an opportunity to negotiate a successor agreement without resorting to economic self-help such as a strike or lock-out." *Wenzel v. Edison Parking Corp.*, 1995 WL 135553, at *4 (S.D.N.Y. Mar. 29, 1995). If the bargaining is unsuccessful, the CBA will eventually terminate of its own force. *See id.* (noting that CBA subject to collective bargaining does not "continue indefinitely into the future").

The bargaining here, on the contrary, culminated in a renewal of the CBA with amendments, not in its termination. To adopt Defendants' position that the Local 175-NYICA CBA was terminated any time a party proposed changes to it would nullify the very purpose of the assumption agreement, which expressly anticipated that NYICA would "negotiate amendments, renewals and extensions," Priolo Decl., Ex. G ¶ 5, resulting in successor CBAs that would bind its members.

In sum, the Court holds that Local 175's letter seeking to negotiate changes to its CBA with NYICA did not terminate the assumption agreement. As a result, Manco was bound by the successors to the 2005 CBA.

C.   **Liability as Single Employers/Alter Egos**

Of the three Defendants, only Manco signed the assumption agreement binding it to the 2005 Local 175-NYICA CBA and its successors. However,

6

Manco ceased operations in 2010, making it extremely unlikely that it employed any members of Local 175 between 2014 and 2020. Presumably recognizing this, the Funds argue that Manetta and Rimani are also bound by the 175 Local-NYICA CBAs to make contributions.

Their argument is based on two distinct but related doctrines: "single employer" liability and "alter ego" liability. Both are typically issues of fact, making them inappropriate for summary judgment unless the factfinder could reach only one reasonable conclusion based on the undisputed facts. *See Lihli Fashions Corp. v. N.L.R.B.*, 80 F.3d 743, 747 (2d Cir. 1996). The Court addresses each theory of liability in turn.

1. **Single Employer Liability**

"[A] collective bargaining agreement may be enforced against non-signatory employers if the employers constitute a 'single employer' and if the employees of the companies constitute a single appropriate bargaining unit." *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001) (citing *Lihli*, 80 F.3d at 747). "Separate companies are considered a single employer if they are part of a single integrated enterprise." *Id.* (internal quotation marks omitted). The Supreme Court has directed courts to consider four factors to make that determination: "interrelation of operations, common management, centralized control of labor relations and common ownership." *Radio & Television Broad. Technicians Local*

7

*Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965). The Second Circuit also considers as relevant factors "the use of common office facilities and equipment and family connections between or among the various enterprises." *Lihli*, 80 F.3d at 747. "[N]ot every factor need be present, and no particular factor is controlling." *Id.* Rather, the determination "depends on all the circumstances of the case" and, ultimately, on the "absence of an arm's length relationship found among unintegrated companies." *Id.* (internal quotation marks omitted).

The sole owner of both Manco and Manetta is Enrico Manetta, Senior ("Rick"), whose deposition testimony regarding the relationship between the two companies is vague at best. In places, he even appears to concede that Manco signed the CBAs on behalf of Manetta. *See, e.g.*, Dep. of Enrico Manetta (July 20, 2021) at 26 ("I wanted another company [Manco] on deck, which I knew that would be the signatory union for the locals. I wanted to separate the two. One [Manetta] is basically a holding company for the contracts , the other [Manco] is the payroll company.").

However, the Court need not decide whether Manco and Manetta are parts of a "single integrated enterprise"; even if they are, the Funds must also establish that the companies' employees form a "single appropriate bargaining unit." *Lihli*, 80 F.3d at 747. Despite the murkiness of Rick's deposition, it is clear that Manco's assumption agreement was with Local 175's "paving division," and the

8

underlying CBAs to which it was bound covered employees performing various aspects of such work. *See* Priolo Decl., Ex. H art. VIII ("paving and milling of streets and roads," "asphalt restoration," etc.). Although Manetta initially performed similar work, by the time frame at issue, it had shifted to installing "electrical facilities"—what Rick called "utility work"—on projects overseen by contractors such as Consolidated Edison and Verizon. *See* Enrico Manetta Dep. at 12-13. Thus, Manetta's employees performed work completely unrelated to paving, making it inappropriate to include them in the bargaining unit covered by the CBAs to which Manco was bound. *Cf. Lihli*, 80 F.3d at 748 ("The parties concede that the sales and marketing employees of Lihli, Inc. do not constitute an appropriate bargaining unit with the production, maintenance, packing, and shipping employees of Liyan.").[3]

Rimani, by contrast, performs paving work. Although there are other relevant considerations, *see Ferrara v. Oakfield Leasing, Inc.*, 904 F. Supp. 2d 249, 264 (E.D.N.Y. 2012) (listing factors), none precludes the conclusion that

---

[3]Even if their employees do not form a single appropriate bargaining unit, the status of multiple companies as a single employer "has independent legal significance," in that such companies are "jointly and severally liable for each other's debts and obligations." *Lihli*, 80 F.3d at 748. Thus, while Manetta is not bound to make contributions to the Funds as a single employer, it is potentially financially liable for Manco's failure to do so. Such liability is remote, however, because, as noted, it is extremely unlikely that Manco had any covered employees after it ceased operations in 2010.

9

Manco's employees and Rimani's employees could constitute a single appropriate bargaining unit. Therefore, the Court must consider whether Rimani and Manco were part of single integrated enterprise.

Rimani is owned and operated by Rick's sons, Enrico Jr. and Nicholas; there is no evidence that Rick plays any role in the company's management. Although Rimani hires employees from union halls, as Manco did, there is no evidence that the two companies have ever had any employees in common or otherwise coordinated their labor relations. Instead, the Funds' theory of single employer liability is premised in general on the family connection between the companies and, in particular, on the facts that Enrico Jr. and Nicholas worked for Manetta prior to forming Rimani, that Manetta hired Rimani as a consultant before the latter had any clients, that Manetta sold equipment to Ramani at discount prices, and that Manetta allowed Rimani to share its office and storage space at no cost.

This state of affairs would undoubtedly support a finding of fact that Ramani and Manco were not a single employer. *See United Union of Roofers, Waterproofers & Allied Workers Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.*, 547 F. App'x 17, 21 (2d Cir. 2013) (affirming finding of no single employer liability despite father's financing of children's company, training of company's manager, and providing free equipment and office space). The question here, however, is whether the Court can reach the same conclusion *as a matter of law*.

10

One salient fact satisfies the Court that it can.  As noted, Manco ceased operations in 2010.  It was formally dissolved in 2016 and its functions transferred to another entity, which is not a defendant in this case.  Rimani was formed later in 2016.  Thus, Manco and Rimani were never active at the same time.

This fact means that there was no "interrelation of operations" between Manco and Rimani.  In addition, it conclusively demonstrates that, despite some evidence of a non-arm's-length relationship, the two companies could not have been parts of a single integrated enterprise.

### 2. Alter Ego Liability

Like single employer liability, alter ego liability binds one company to the CBAs signed by another.  *See Lihli*, 80 F.3d at 748.  "The hallmarks of the alter ego doctrine include whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership."  *Id.* (internal quotation marks omitted).  Although those considerations overlap with those relevant to determining single employer status, "[t]he focus of the alter ego doctrine, unlike that of the single employer doctrine, is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations."  *Id.* (internal quotation marks omitted).

As explained above, Manco and Manetta were under the common ownership

11

and management of Rick Manetta.  By Rick's own admission, he ran the companies as two parts of a single entity, with Manco hiring union employees to work on Manetta's projects.  Moreover, he did so specifically to "separate the liabilities that each company would take upon."  Enrico Manetta Dep. at 28.  This perfectly describes "an attempt to avoid the obligations of a collective bargaining agreement."  *Lihli*, 80 F.3d at 748.

The Court concluded that Manetta was not liable as a single employer because it ended up focusing on a different type of work.  That same fact might lead to the conclusion that it was not an alter ego of Manco.  *See id*. (finding no alter ego liability despite common ownership and management because "Lihli, Inc. has a business purpose completely different from Liyan and LFC/King Kuo").  Recall, however, that Manetta initially worked on paving projects.  It might be the case—and likely is—that Manetta did not require any workers covered by the CBAs during the period covered by the Funds' complaint.  But its status as an alter ego of Manco at least entitles the Funds to audit its books.  If the audit reveals that Manetta employed covered workers during that period, then it is liable for unpaid contributions to that extent.

As with single employer liability, Rimani stands on a different footing.  It had different ownership and management than both Manco and Manetta.  Even accepting Rick's description of the relationship between Manco and Manetta, there

12

is no evidence that Ramani inherited Manetta's customers or projects, although it worked in the same general field that Manetta began in and acquired some of its equipment.

Once again, the dispositive factor is timing. The fact that Rimani entered the paving industry years after Manco and Manetta had exited it, coupled with its corporate independence, satisfies that Court that it was not created merely to avoid the obligations of the CBAs signed by Manco.

**D.    Conclusion**

The Court holds, as a matter of law, that the Funds' complaint is timely with respect to claims for contributions due on or after October 5, 2014, and that Manco is bound by the CBAs between Local 175 and NYICA notwithstanding Local 175's letter of March 12, 2008. With respect to those issues, the Funds' motion for summary judgment is granted and the Defendants' motions are denied.

The Court further holds, as a matter of law, that neither Manetta nor Rimani is bound by the CBAs between Local 175 and NYICA on a theory of single employer liability. With respect to that issue, the Funds' motion for summary judgment is denied and Manetta's and Rimani's motions are granted.

The Court further holds, as a matter of law, that Manetta is bound by the CBAs between Local 175 and NYICA on a theory of alter ego liability. With respect to that issue, the Funds' motion for summary judgment is granted and

Manetta's motion is denied.

Finally, the Court holds, as a matter of law, that Rimani is not bound by the CBAs between Local 175 and NYICA on a theory of alter ego liability. With respect to that issue, the Funds' motion for summary judgment is denied and Rimani's motion is granted.

In accordance with the foregoing holdings, Manco and Manetta shall submit to an audit of their respective books for the period from October 5, 2014, to October 20, 2020. Any issues concerning the timing, scope, or other terms of the audit that the parties are unable to resolve should be addressed, in the first instance, to the assigned magistrate judge.

**SO ORDERED.**

  /S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 31, 2023